# Exhibit 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO:  13-cv-24506-DIMITROULEAS

CITY OF MIAMI,
a Florida municipal Corporation,

       Plaintiff,

                            DEMAND FOR JURY TRIAL

v.

~~BANK OF AMERICA CORPORATION;~~
BANK OF AMERICA, N.A.;
**and** COUNTRYWIDE ~~FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS; and COUNTRYWIDE~~**BANK, FSB,** ~~BANK, FSB,~~

       Defendants.

_____ /

### ~~SECOND~~**THIRD** AMENDED COMPLAINT
### FOR VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT

**Table of Contents**

Page

I.      NATURE OF THE ACTION ........................................................................ 1

        A.      Bank of America Has Engaged in a Continuing Pattern of Discriminatory
                Mortgage Lending Practices in Miami Resulting in Foreclosures. .................. 1

II.     PARTIES ................................................................................................ ~~8~~7

III.    REFERRALS FROM BANK REGULATORY AGENCIES .......................... ~~11~~10

IV.     JURISDICTION AND VENUE .............................................................. ~~12~~11

V.      BANK OF AMERICA ENGAGED IN DISCRIMINATORY LENDING
        PRACTICES ........................................................................................ ~~13~~12

        A.      ~~Specific Unlawful Lending Practices 13~~**Facially neutral business policies and
                practices that created an "artificial, arbitrary, and unnecessary" barrier to
                fair housing opportunities for minority home purchasers and owners.**  12

        B.      Bank of America Intentionally Discriminated Against Minority Borrowers in
                Violation of the Fair Housing Act, as Demonstrated by Former Bank
                Employees. ................................................................................. ~~14~~13

                1.      BoA targets minorities for ~~predatory~~**discriminatory** loan terms. ...... ~~14~~13

                2.      BoA incentivized employees to steer minority borrowers into
                        **discriminatory** ~~predatory~~ loans. ..................................... ~~15~~14

                3.      BoA underwrites teaser rate loans that borrowers cannot afford. ...... ~~16~~15

                4.      BoA induced foreclosures by failing to offer refinancing or loan
                        modifications to minority customers on fair terms, and otherwise
                        limiting equal access to fair credit. ........................................ ~~17~~16

        C.      Minorities in Miami Receive ~~Predatory~~**Discriminatory** Loan Terms from Bank
                of
                America Regardless of Creditworthiness. .................................................. 17

        D.      Miami's Data Analysis Is Corroborated by Additional Studies/Reports. ...... ~~20~~19

        E.      Bank of America's ~~Targeting of Minorities Who in Fact Receive
                Predatory~~**Discriminatory Lending Practices Cause Foreclosures.**  21

~~Loan Terms Regardless of Creditworthiness Causes Foreclosures.~~ ~~22~~

                1.      Data shows that Bank of America's foreclosures are disproportionately
                        located in minority neighborhoods in Miami. ............................ ~~22~~21

                2.      Data shows that Bank of America's loans to minorities result in
                        especially quick foreclosures in Miami. .................................... 23

                3.      Data shows that the discriminatory ~~loan terms~~**lending practices** cause
                        the foreclosures
                        in Miami. ...................................................................... ~~25~~24

i

VI.   INJURY TO MIAMI CAUSED BY BANK OF AMERICA'S DISCRIMINATORY
      LOAN PRACTICES ................................................................. 28**27**

      A.   Non-Economic Injuries ......................................................... 28

      B.   Economic Injuries ............................................................... 29

           1.   Miami has been injured by a reduction in property tax revenues from
                foreclosures caused by **Bank of America's** discriminatory loans issued
                by**lending practices.** ..................................................... **29**

                Bank of America. ............................................................. 30

           2.   Miami is injured because it provided and still must provide costly
                municipal services for foreclosure properties in minority neighborhoods
                as a direct result of **Bank of America's** discriminatory loans originated
                or purchased by**lending**
                Bank of America**practices**. ................................................ 33**32**

VII.  SAMPLE PROPERTIES IN THE CITY OF MIAMI ..................................... 36**35**

      A.   Foreclosures ................................................................... 36**35**

      B.   Predatory**Discriminatory** Loans Issued Subsequent to December 13, 2011. .... 36

VIII. CLAIM FOR RELIEF ............................................................... 37

DEMAND FOR JURY TRIAL ............................................................... 39**40**

PRAYER FOR RELIEF ................................................................... 40

## I.    NATURE OF THE ACTION

1.    Plaintiff City of Miami ("Miami" or the "City") brings this action against Bank of America (hereafter "BoA" or the "Bank") for the economic impact of its longstanding, unbroken policy and practice of **both intentionally** steering minority borrowers in Miami into "~~predatory~~**discriminatory**" mortgage loans (defined herein as loans that have higher costs and risk features than more favorable and less expensive loans issued to similarly situated white borrowers) and ~~for its~~**engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.  Additionally, BoA maintained a** policy of refusing to extend credit to minority borrowers who desired to refinance the more expensive loans they previously received when such credit was extended to white borrowers.

2.    The adverse impact that the Bank's mortgage lending policies and practices would cause in terms of widespread economic and non-economic damages throughout the City were entirely foreseeable through a variety of analytical tools and published reports available to the Bank.

### A.    Bank of America Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures.

3.    This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.,* by the City of Miami to seek redress for injuries caused by Bank of America's[1] pattern or practice of illegal and discriminatory mortgage lending. Specifically, Miami seeks injunctive relief and damages for the injuries caused by (1) the

---

[1] Defendants collectively are referred to as "BoA," including:  Bank of America ~~Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans~~**, N.A.,** and Countrywide Bank, FSB. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, Countrywide Bank, N.A., First Franklin Corporation, Grand Harbor Mortgage, John Laing Homes, Nexstar Financial Corporation, and Treasury Bank National Association.

1

origination of ~~predatory~~**discriminatory** mortgage loans in minority neighborhoods and to minority borrowers that are the result of BoA's unlawful and discriminatory lending practices, and (2) the Bank's subsequent refusal to extend credit to minority borrowers seeking to refinance previously issued ~~predatory~~**discriminatory** loans.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.  BoA's policies and practices identified herein were not justified by business necessity or legitimate business interests.  There were less costly and thus less discriminatory alternatives available to BoA that would have achieved the same business goals as were achieved by these policies and practices.

4.      The State of Florida in general, and the City of Miami in particular, have been devastated by the foreclosure crisis.  As recently as the year ending 2014, Florida had the country's highest foreclosure rate, and Miami had the second highest foreclosure rate among metropolitan statistical areas with a population of at least 200,000 residents.[2]  Moreover, Florida is by far the leading state in the country with regard to owner-vacated or "Zombie" foreclosures.[3]  Since 2008, banks have foreclosed on approximately 1.8 million homes in Florida, and BoA's discriminatory conduct is responsible for a significant number of these foreclosures.

5.      The foreclosure crisis in Florida resulted in such drastic consequences that the Florida Supreme Court established a Task Force to recommend "policies, procedures,

---

[2] RealtyTrac, *Year-End 2014 U.S. Foreclosure Market Report* (Jan. 15, 2015), *available at* http://www.realtytrac.com/news/foreclosure-trends/1-1-million-u-s-properties-with-foreclosure-filings-in-2014-down-18-percent-from-2013-to-lowest-level-since-2006/.

[3] RealtyTrac, *Q1 2013 Foreclosure Inventory Update,* at 5, *available at* http://www.realtytrac.com/images/reportimages/RealtyTrac_Foreclosure_Inventory_Analysis_Q 1_2013.pdf.

strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties."[4]

6.      While Bank of America has adapted to changing market conditions necessitated by enhanced public scrutiny of its mortgage lending practices, one issue has remained constant since at least 2004—the Bank has systematically engaged in a continuous and unbroken pattern and practice of ~~steering~~**issuing discriminatory mortgage loans to** minority borrowers in Miami ~~into predatory mortgage loans~~ when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers.  Upon information and belief this unlawful pattern and practice continues through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the FHA has not commenced to run.

7.      The pattern and practice of lending discrimination engaged in by Bank of America includes traditional redlining[5] and reverse redlining,[6] both of which have been deemed to violate the FHA by federal courts throughout the country.  BoA engaged in redlining, and upon information and belief continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Miami on equal terms as to non-minority borrowers.  BoA engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on ~~predatory~~**discriminatory** terms to minority borrowers in minority neighborhoods in Miami on the basis of the race or ethnicity of its residents.  As

---

[4] Florida Supreme Court Task Force on Residential Mortgage Foreclosure Cases, *Final Report and Recommendations on Residential Mortgage Foreclosure Cases* (Aug. 17, 2009), *available at* http://www.floridasupremecourt.org/pub_info/documents/Filed_08-17-2009_Foreclosure_Final_Report.pdf.
[5] Redlining is the practice of denying credit to particular neighborhoods based on race.
[6] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

former Federal Reserve Chairman Ben Bernanke acknowledged, these twin evils of mortgage discrimination "continue to have particular significance to mortgage markets."[7]

8.     Major banks such as Bank of America have a long history of engaging in redlining throughout Miami.  That practice began to change in the late 1990s, when BoA adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products as compared to the mortgage loans issued to similarly-situated white borrowers (reverse redlining).

9.     BoA's discriminatory lending practices knowingly place vulnerable, underserved borrowers in loans they cannot afford.  This practice maximizes BoA's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods, resulting in an excessively high number of more expensive loans in Miami.  Moreover, Bank of America has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market.

10.    Bank of America's discriminatory misconduct has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Miami. These foreclosures often occur when a minority borrower who previously received a ~~predatory~~**discriminatory** loan sought to refinance the loan, only to discover that Bank of America refused to extend credit at all, or on equal terms as refinancing similar loans issued

---

[7] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia, *Challenges in Housing and Mortgage Markets,* at 10 (Nov. 15, 2012), *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

to white borrowers.   The inevitable result of the combination of issuing unnecessarily expensive or inappropriate loans, and then refusing to refinance the loans, was foreclosure.

11.     Bank of America's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the loans it has made in the minority neighborhoods of Miami.  Foreclosures on loans originated by Bank of America are concentrated in these neighborhoods.  *A loan in a predominantly minority neighborhood is 5.857 times more likely to result in foreclosure than is a loan in a neighborhood with a majority of white residents.*

12.     The reports of these witnesses are confirmed when Miami data on BoA loans is examined.   Such an examination reveals a widespread practice of discrimination.   For example, a regression analysis that *controls for credit history* and other factors demonstrates that an African-American BoA borrower is 1.581 times more likely to receive a predatory loan than is a white borrower and a Latino borrower is 2.087 times more likely to receive such a loan.   The regression analysis confirms that African-Americans with FICO scores over 660 are 1.533 times more likely to receive a predatory BoA loan than is a white borrower, and a Latino borrower is 2.137 times more likely to receive such a loan.

13**12**.   Bank of America would have had comparable foreclosure rates in minority and white communities if it was properly and uniformly applying responsible underwriting practices in both communities.   Bank of America possesses sophisticated underwriting technology, analytic tools, data, and access to reports that allow it to foreseeably predict with precision the likelihood that it had issued an improperly more expensive loan, as well as the likelihood the loan would result in delinquency, default, or foreclosure.[8] And if that was not

---

[8] The scope of Bank of America's risk analysis policies and practices is set forth in detail throughout the Bank's 2014 Annual Report, *available at* http://media.corporate-

sufficient, the Bank had branch offices located in Miami and knew, or certainly should have known, of the adverse consequences of its lending misconduct to minority borrowers and the City regardless of whether the Bank subsequently sold the loan or servicing rights to a third party.   Consequently, the Bank's issuance of improperly more expensive loans to minority borrowers was not the result of random events.

~~14~~**13**.  While Bank of America purports to be a good corporate and community citizen, the reality is exactly the opposite.  The Bank was putting its financial interests ahead of its customers and the City of Miami in order to maximize profits.

~~15~~**14**.  The Bank's ~~predatory and~~ discriminatory lending practices are evidenced by information from confidential witness statements provided by former employees of Bank of America (discussed further herein).   For example:

    a)    "They [the less savvy minority borrower] didn't know anything about it [negative amortization loans].  The white American educated [borrower] knew what those loans were and what they were going to do, and they stayed away from them. . . . [The less savvy minority borrower] didn't realize the negative amortization consequences down the road for them that would make it that much harder to refinance with no equity."

    b)    Borrowers "couldn't afford ["interest-only" and "pick-a-payment" loans].  Half the time they couldn't even afford the [full] interest on those homes."

    c)    "There's no money in [Community Reinvestment Act] loans for [the Bank]" so the Bank didn't encourage loan officers to make CRA loans.

    d)    Back-end premiums [the difference between the borrower's loan rate and the rate the bank pays for it] were "non-disclosed," which often eluded less educated, minority borrowers.

~~16~~**15**.  The reports of these witnesses are confirmed when the Miami data on Bank of America loans is examined.   Such an examination reveals a widespread practice of

---

the Bank's 2014 Annual Report, *available at* ~~http://media.corporate-ir.net/media_files/IROL/71/71595/AR2014.pdf~~ **http://media.corporate-ir.net/media_files/IROL/71/71595/AR2014.pdf**.

6

discrimination.  For example, a regression analysis that *controls for credit history* and other factors demonstrates that an African-American Bank of America borrower was 1.581 times more likely to receive a ~~predatory~~**discriminatory** loan as a white borrower and a Latino borrower 2.087 times more likely.  The regression analysis confirms that African-Americans with FICO scores over 660 are 1.533 times more likely to receive a ~~predatory~~**discriminatory** Bank of America loan as a white borrower, and a Latino borrower 2.137 times more likely.

~~17~~**16**.  According to a Justice Department complaint, BoA's Countrywide subsidiary: (i) had charged upwards of 200,000 minority homeowners higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings; (ii) had failed to offer minority homeowners conventional mortgages for which they qualified and which they would have been offered, were they white; and (iii) systematically pushed minority borrowers into exploitative mortgages with higher rates and fees.  Many of the victims were in Florida.  To settle the complaint, Bank of America agreed to pay $335 million in restitution and penalties to the 200,000 identified minority victims—without compensation, restitution, or penalties to the City of Miami.

~~18~~**17**.  In or about June 2011, BoA settled charges with the Federal Trade Commission alleging that Countrywide had charged excessive fees to homeowners for property maintenance when they went into default, and added illegitimate charges to what the homeowners owed.  To settle the FTC complaint, Bank of America paid $107 million to the FTC for distribution to homeowner victims—again without compensation to the City of Miami.

~~19~~**18**.  According to former Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.

Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[9]

2019.  The discriminatory lending practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history." It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[10] As Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[11] The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African-Americans."[12]

## II.   PARTIES

2120.  Plaintiff City of Miami is a Florida municipal corporation.  The City has maintained an active and longstanding interest in the quality of life and the professional opportunities that attend an integrated community.  One way that the City has furthered these

---

[9] Bernanke, *supra* n.7.
[10] Robert Schwemm & Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 Harv. C.R.-C.L. L. Rev. 375, 382 (2010).
[11] Bernanke, *supra* n.7.
[12] Charles Nier III & Maureen St. Cyr, *A Racial Financial Crisis:  Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act,* 83 Temple L. Rev. 941, 942 (2011).

interests is through its Department of Community and Economic Development, which is charged with responsibility for operating the City's fair housing program, reducing illegal housing discrimination, monitoring and investigating fair housing complaints, supporting fair housing litigation, and conducting research and studies to identify and address fair housing impediments as a means of improving the overall quality of life in the city.  The City is authorized by the City Commission to institute suit to recover damages suffered by the City as described herein.

2221.  Bank of America, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in Charlotte, North Carolina.  It maintains multiple offices in the State of Florida, including in the City of Miami, for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

23.   During the period of time relevant to the events at issue in this Complaint through July 1, 2008, Defendant Countrywide Financial Corporation ("CFC") was a Delaware-incorporated financial holding company or savings and loan holding company with its principal business office in Calabasas, California.  CFC created, authorized, and/or ratified the lending-related policies and practices at issue in this Complaint that its divisions and subsidiaries implemented.

24.   On July 1, 2008, Bank of America Corporation ("BAC"), a Delaware-incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities.  Since that acquisition, CFC has remained a Delaware-incorporated company with its principal business office in Calabasas, California, as a direct, wholly-owned subsidiary of BAC.

25.   Defendant Countrywide Home Loans, Inc. ("CHL") is a New York-incorporated wholly-owned subsidiary of CFC with its principal business office in Calabasas, California.  Prior to 2008, CHL funded the majority of CFC's nationwide residential mortgage loan origination activity.  For the loans it funded under the Countrywide name, CHL was the named lender on the promissory notes for those loans.  CHL became a wholly-owned indirect subsidiary of BAC on or about July 1, 2008, as a result of BAC's acquisition of CFC.

26**22**.   Countrywide Bank ("CWB") was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company **Countrywide Financial Corporation ("**CFC**")**.  CWB was headquartered in Alexandria, Virginia, until February, 2009.  As a financial holding company, CFC, together with its subsidiary **Countrywide Home Loans, Inc., ("**CHL,**")** was supervised by the Board of Governors of the Federal Reserve System.  On or about March 12, 2007, CWB changed its charter to that of a federal savings association, and CFC became a savings and loan holding company.  Those changes caused CWB, CFC, and CHL to become subject to supervision by the Office of Thrift Supervision.

27**23**.   During 2006, CFC began the process of transitioning the funding of its residential loan originations from CHL to CWB.  For those loans funded through CWB under the Countrywide name, CWB was the named lender on the promissory notes for those loans.  As of January 1, 2008, CWB funded substantially all nationwide residential loan origination activity using the Countrywide name.  For those loans funded by either CHL or CWB, CFC used the same loan origination policies and procedures that it had created, authorized, or ratified, and the same employees and mortgage brokers.  Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide."

2824.   Even after BAC's purchase of CFC on July 1, 2008, CWB continued its banking and mortgage lending operations as a direct subsidiary of CFC, using the same loan origination policies and procedures, until approximately November 7, 2008.  At that time, **Bank of America Corporation ("**BAC**")** engaged in a series of corporate transactions that ended CWB's status as a subsidiary of CFC and made CWB a direct subsidiary of BAC.

2925.   On April 23, 2009, the Office of the Comptroller of the Currency approved CWB's request to convert its charter back to that of a national bank and the request by Bank of America, N.A. to then immediately acquire CWB by merger.  These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist.  Bank of America, N.A. was the surviving institution resulting from this merger.  Thus, Bank of America, N.A. is the successor in interest to CWB.

3026.   The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated thereunder.  The FHA prohibits financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their residential real estate-related lending transactions.

3127.   The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Miami within the meaning of the FHA, 42 U.S.C. § 3605.

3228.   Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Merrill Lynch Bank & Trust FSB, Merrill Lynch Credit Corp., and First Franklin Financial Corp.

33**29**.   Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.   Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.   Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.   REFERRALS FROM BANK REGULATORY AGENCIES

34**30**.   In 2006, Federal Reserve System Examiners initiated a fair lending review of CHL's mortgage pricing practices.   As a result of that review, the Federal Reserve Board ("FRB") determined that it had "reason to believe that Countrywide Home Loans engaged in a pattern or practice of discrimination based on race and ethnicity in violation of Section 701(a) of the Equal Credit Opportunity Act and the Fair Housing Act."

35**31**.   Subsequently, pursuant to 15 U.S.C. § 1691e(g), the FRB referred the matter to the Department of Justice on March 5, 2007.   Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the FRB referral would be tolled from March 22, 2007 through December 22, 2011.

36**32**.   In early 2008, the Office of Thrift Supervision ("OTS") conducted an examination of the operations of Countrywide, including its compliance with applicable fair lending laws and regulations.   As a result of that examination, the OTS determined that it had "a 'reason to believe' that Countrywide has displayed a 'pattern or practice' of discriminating against minority loan applicants in the pricing of home loans and against married couples concerning the terms and condition of home loans."

12

37**33**.   Subsequently, pursuant to 15 U.S.C. § 1691e(g), the OTS referred the matter to the Department of Justice on June 27, 2008.   Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the OTS referral would be tolled from July 1, 2009 through December 22, 2011.

38**34**.   Based on the FRB and OTS referrals, the Department of Justice engaged in a lengthy investigation of Countrywide's lending policies, practices, and procedures, including reviewing millions of Countrywide loans originated between 2004 and 2008.   The investigation led to the Justice Department's complaint against Countrywide for discriminatory lending practices affecting upwards of 200,000 minority homeowners (saddling them with higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings).

## IV.   JURISDICTION AND VENUE

39**35**.   This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

40**36**.   Venue is proper in this district under 28 U.S.C. § 1391(b) because Bank of America conducts business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## V.   BANK OF AMERICA ENGAGED IN DISCRIMINATORY LENDING PRACTICES

A. Specific Unlawful Lending Practices

**A.   Facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.**

41**37**.   Bank of America engaged in numerous ~~discriminatory~~**facially neutral** lending practices **resulting in the disparate impact statistical analysis** during the time periods at issue herein.  These practices are united because they represent ~~mainfestations~~**manifestations** of the same continuous and unbroken practice of ~~steering minority borrowers into disadvantageous loans~~**engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.**  A partial list of these practices include, but is not limited to, the following:

a.   **knowing about lending practices that either risked or resulted in** failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

b.   ~~reverse redlining~~**failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history**;

c.   placing borrowers in more expensive, riskier loans they qualified for;

d.   failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s;[13]

---

[13] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable. Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

e.    failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity;

f.    allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford;

g.    ~~failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history;~~ **marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods;**

h.    requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their ~~predatory~~**discriminatory** loan to a prime loan;

i.    charging excessive points and fees that are not associated with any increased benefits for the borrower;

j.    creating a compensation scheme incentivizing employees to ~~steer minority borrowers into predatory~~**issue discriminatory** loans; and

k.    ~~redlining.~~**failing to .monitor and ensure compliance with federal fair lending laws.**

**B.    Bank of America Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees.**

~~42~~**38**.    Confidential Witnesses ("CWs") are former Bank of America employees responsible for making and/or underwriting loans on behalf of Bank of America in the greater Miami region.  CWs describe how Bank of America has targeted minorities and residents of minority neighborhoods in and around Miami for ~~predatory~~**discriminatory** lending practices.

~~43~~**39**.    CW1 was a mortgage loan officer with BoA from 2008 to 2010; she worked in the Bank's Miami-Dade County mortgage lending center in 2010.

~~44~~**40**.    CW2 was a mortgage loan officer for BoA from 2011 to 2013.  Part of his time as a BoA loan officer was spent working in a Miami Beach branch.  CW2's job

15

involved writing new mortgages, refinancing mortgages, and helping customers obtain loans through the federal Home Affordable Refinance Program.

45**41**. CW3 was a mortgage loan officer for BoA in Florida from 2005 to 2008; he worked on loans throughout the Miami area.

### 1.   BoA targets minorities for ~~predatory~~**discriminatory** loan terms.

46**42**. According to CW2, a large percentage of the people who wanted to refinance because they were struggling to pay the note on a negative amortization loan were minorities who were not savvy financially. "They (the less savvy minority borrower) didn't know anything about it," he said. "The white American educated (borrower) knew what those loans were and what they were going to do, and they stayed away from them." CW2, who has had his mortgage broker's license for over 25 years, said he believed BoA targeted less savvy minorities for these types of onerous loans.

47**43**. CW2 added that "most people just knew about or wanted to pay that minimum (monthly payment) only. They're in a house and have a roof over their head and didn't realize the negative amortization consequences down the road for them that would make it that much harder to refinance with no equity."

48**44**. CW3 said that most of the borrowers he dealt with in the Miami area were minorities. He explained that "interest-only" and "pick-a-payment" loans were popular in Miami, and he understood that borrowers were approved for such loans based on repayment of interest payments alone - not interest and principal. In CW3's experience, few of the borrowers were able to pay down the loan principal on these loans along with the interest every month. "After four or five years, that's how everything went the way it did," he said. "They couldn't afford it. Half the time they couldn't even afford the (full) interest on those

homes." BoA paid its employees more for steering minorities into ~~predatory~~**discriminatory** loans.

**45.** **Upon information and belief, the practices and problems described by these confidential witnesses have continued into the present.**

### 2. BoA incentivized employees to steer minority borrowers into ~~predatory~~discriminatory loans.

~~49~~**46**. According to CW1, the most beneficial type of loan for low-income buyers was the CRA loan, which allowed borrowers to obtain large grants for the down payments and closing costs. CRA loans were designed in part to discourage redlining. But, as CW1 explained, "there's no money in those loans for [the Bank]" so the Bank didn't encourage loan officers to make CRA loans.

~~50~~**47**. At BoA, the CRA loan process was slow, complicated and labor-intensive. Notably, BoA paid loan officers less commissions on CRA loans than it paid on FHA and other government loans, CW1 said. In effect, BoA incentivized loan officers to put low-income borrowers into less advantageous FHA loans over CRA loans. The Bank did so by paying higher commissions for the FHA loans—CW1 said loan officers received an extra 15 percent in commission on FHA loans compared to CRA loans. CW1 added that minorities missed out on opportunities to get into a CRA loan through BoA.

~~51~~**48**. CW3 explained that BoA loan officers earned origination fees and back-end premiums (the difference between the borrower's loan rate and the rate the bank pays for it). He said the back-end premiums were not disclosed to borrowers. He added that loan officers were allowed to charge up to 3 points on the front-end at origination plus up to 5 or 6 points on the back-end. According to CW3, this often eluded less educated, minority borrowers.

**49.    Upon information and belief, the practices and problems described by these confidential witnesses have continued into the present.**

### 3.    BoA underwrites teaser rate loans that borrowers cannot afford.

~~52~~**50**.  BoA originated loans with low teaser rates (e.g., "pick-your-payment" loans, negative amortization loans, etc.), marketed to borrowers from predominantly minority neighborhoods in Miami.  Unless properly underwritten, such loans are destined to fail.

~~53~~**51**.  BoA does not properly underwrite these loans when made to minorities and in minority neighborhoods.  BoA does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to BoA at the time the loans were made.

~~54~~**52**.  The confidential witness statements of CW2 and CW3 support that BoA underwrote these loans as if the teaser rate will apply for the full life of the loan instead of considering the borrowers' ability to repay the loan after the teaser rate expires.

~~55~~**53**.  The use of negative amortization loans, pick-a-payment notes, and/or other teaser-rate adjustable loans in the manner described above is consistent with the practice of reverse redlining, has subjected minority borrowers to unfair and deceptive loan terms, and has contributed significantly to the high rate of foreclosure found in the minority neighborhoods of Miami.

**54.    Upon information and belief, the practices and problems described by these confidential witnesses have continued into the present.**

### 4.    BoA induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.

5655.  CW2 explained that, in the 2011-2013 timeframe, BoA did not offer regular refinancing to persons with mortgages at over 80% of the value of the house.  Consequently, BoA refused to refinance many of the teaser loans (e.g., negative amortization loans) that it previously marketed to borrowers.  CW2 said many of the people in this situation were facing the high likelihood of losing their homes, and many of them were minorities in Miami, both Latinos and African-Americans.

5756.  In this manner, BoA induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms—which constitutes a particularly egregious form of redlining, given that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

**57.   Upon information and belief, the practices and problems described by these confidential witnesses have continued into the present.**

C.   **Minorities in Miami Receive** ~~Predatory~~**Discriminatory Loan Terms from Bank of America Regardless of Creditworthiness.**

58.   As discussed herein, a ~~non-exhaustive~~**non-exhaustive** list of the types of loans that Bank of America ~~steered~~**issued to** minorities ~~into~~ when they otherwise qualified for less expensive and less risky loans include the following:  high-cost loans (i.e., loans with an interest rate that was at least 3% above the Treasury rate prior to 2010 and 1.5% above the prime mortgage rate thereafter),[14] subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, higher

---

[14] This definition applies to first lien loans.

[15] FHA loans are insured by the Federal Housing Administration and require borrowers to pay for mortgage insurance and may entail other costs. People with credit scores under 500 generally are ineligible for FHA loans.

[16] VA loans are guaranteed by the U.S. Department of Veterans Affairs, available to veterans or surviving spouses who do not remarry, and generally do not require a down payment on the property.

cost government loans, including FHA[15] and VA[16] loans, and HELOCs, and/or ARM loans with teaser rates (i.e., lifetime maximum rate greater than initial rate + 6%).

59.    Data reported by the Bank and available through both public and private databases shows that minorities in Miami received unfavorable loan terms from Bank of America more frequently than white borrowers regardless of creditworthiness.

60.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004 to 2012, an African-American borrower was 1.581 times more likely to receive a ~~predatory~~**discriminatory** loan as a white borrower possessing similar underwriting and borrower characteristics.[17] The regression analysis further demonstrates that the odds that a Latino borrower would receive a ~~predatory~~**discriminatory** loan was 2.087 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a ~~predatory~~**discriminatory** loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.[18]

61.    The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 1.533 times more likely to receive a ~~predatory~~**discriminatory**

---

[15] FHA loans are insured by the Federal Housing Administration and require borrowers to pay for mortgage insurance and may entail other costs. People with credit scores under 500 generally are ineligible for FHA loans.

[16] VA loans are guaranteed by the U.S. Department of Veterans Affairs, available to veterans or surviving spouses who do not remarry, and generally do not require a down payment on the property.

[17] As alleged throughout the Complaint, all references to the date range 2004-2012 are intended to include the time period up to and including December 31, 2012.

[18] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 10%.

loan as a white borrower with similar underwriting and borrower characteristics.   A Latino borrower with a FICO score above 660 was 2.137 times more likely to receive a ~~predatory~~**discriminatory** loan as a white borrower with similar underwriting and borrower characteristics.   These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

62.   A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Miami were more likely to receive ~~predatory~~**discriminatory** loans than borrowers in heavily white neighborhoods.   For example, a borrower in a heavily minority census tract (census tract consisting of at least 90% African-American or Latino households) was 1.585 times more likely as a borrower with similar characteristics in a non-minority neighborhood (census tract with at least 50% white households) to receive a ~~predatory~~**discriminatory** loan.   These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

63.   Additionally, data reported by the Bank and available through public databases shows that in 2004-2012, 21.9% of loans made by Bank of America to African-American and Latino customers in Miami were high cost, but only 8.9% of loans made to white customers in Miami were high cost.   This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.

64.   Thus, the disparities in Miami are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

65. The following map (page 20) of Bank of America ~~predatory~~ loans originated in Miami between 2004 and 2012 illustrates the geographic distribution of ~~predatory loans in African American and Latino neighborhoods and white neighborhoods in Miami. This map demonstrates that Bank of America's predatory loans are disproportionately located~~**the Bank's discriminatory lending practices and the resulting consequences** in minority neighborhoods.



66.   The fact that ~~predatory~~ loans ~~involving all of~~**issued pursuant to** Bank of America's ~~loan products~~**discriminatory lending practices** are more heavily concentrated in minority neighborhoods in Miami ~~is consistent with the practice of reverse redlining and~~**has,**

**based** upon information and belief, ~~has~~ contributed significantly to the disproportionately high rates of foreclosure in **the City's** minority communities ~~in Miami~~.

      **D.**    **Miami's Data Analysis Is Corroborated by Additional Studies/Reports.**

67.    According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 Harv. C.R.-C.L. L. Rev. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

68.    Likewise, according to *A Racial Financial Crisis,* 83 Temple L. Rev. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers—African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

69.    Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes." Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites-6.2%; African-American-21.4%; and Latino-19.3%.[19]

---

[19] Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (Nov. 2011), at 5, 21, *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf.

70.     The Miami high-cost analysis is similar to national trends as confirmed by an analysis of the HMDA data for the period 2012-2014.  According to a report prepared by the Center for ~~Respnsible~~**Responsible** Lending, "[t]he percentage of African-Americans with high cost loans rose from 5.3% in 2012 to 14.2% in 2013 to 25.5% in 2014.  Similarly, the rate rose from 5.9% in 2012 to 16.8% in 2013 to 28.3% in 2014 for Latino borrowers."[20]

71.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Latino borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers.  These relationships hold both for home-purchase and refinance lending and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[21]

72.     African-Americans and Latinos were much more likely to receive ~~predatory~~**discriminatory** loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans

---

[20] Center for Responsible Lending Issue Brief, *Mortgage Lending Continues Under Dodd-Frank,* at 5 (Sept. 22, 2015), *available at* http://www.responsiblelending.org/mortgage-lending/policy-legislation/2014-hmda.html.
[21] Federal Reserve Bulletin, *The Mortgage Market in 2011:  Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012), *available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf.

and Latinos received a high interest rate loan more than three times as often as white borrowers.[22]

73.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties.  Disparities in the incidence of these features are evident across all segments of the credit spectrum.

**E.**     **Bank of America's** ~~Targeting of Minorities Who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes~~**Discriminatory Lending Practices Cause** **Foreclosures.**

**1.**     **Data shows that Bank of America's foreclosures are disproportionately located in minority neighborhoods in Miami.**

74.     ~~Bank of America has intentionally targeted predatory mortgage lending practices at African-American and Latino neighborhoods and residents.~~  Far from being a responsible provider of much-needed credit in minority communities, ~~BoA is~~**BoA's discriminatory lending practices are** a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 75%.

75.     Although 53.3% of BoA's loan originations in Miami from 2004 to 2012 were in census tracts that are at least 75% African-American or Latino, 62.5% of loan originations that had entered foreclosure by June 2013 were in those census tracts.  Similarly, while 84.7% of BoA's loan originations in Miami from 2004 to 2012 occurred in census tracts that are at least 50% African-American or Latino, 95.7% of BoA's loan originations that had entered

---

[22] Center for Responsible Lending, *Lost Ground, 2011, supra* n.19.

foreclosure by June 2013 were in those census tracts.  Moreover, while 15.3% of BoA's loan originations in Miami from 2004 to 2012 occurred in census tracts that were less than 50% African-American or Latino, only 4.3% of BoA's loan originations that had entered foreclosure by June 2013 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.  **Upon information and belief, a similar pattern of foreclosures will take place with more recent unfavorable loans.**

76.    The following map (page 25) represents the concentration of BoA's loan originations from 2004 through 2012 that had entered foreclosure by February 2013 in African-American and Latino neighborhoods.  In addition to the disproportionate distribution of BoA foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate BoA's failure to follow responsible underwriting practices in minority neighborhoods.    While 32.8% of BoA's loans in predominantly (greater than 90%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 7.7% of its loans in non-minority (greater than 50%) neighborhoods.  In other words, a BoA loan in a predominantly African-American or Latino neighborhood is 5.857 times more likely to result in foreclosure as is a BoA loan in a non-minority neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.



77.     Thus, Bank of America's ~~pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness,~~ **discriminatory lending practices** have caused and continue to cause foreclosures in Miami.

28

        **2.**      **Data shows that Bank of America's loans to minorities result in especially quick foreclosures in Miami.**

78.     A comparison of the time from origination to foreclosure of Bank of America's loans originated in Miami from 2004 to 2012 shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure. The average time to foreclosure for African-American borrowers is 3.144 years, and for Latino borrowers is 3.090 years.  By comparison, the average time to foreclosure for white borrowers is 3.448 years.  These statistically significant disparities demonstrate that Bank of America aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

79.     This disparity in time to foreclosure is further evidence that Bank of America is engaged in **discriminatory** lending practices ~~consistent with reverse redlining~~.  The disparity in time to foreclosure demonstrates that Bank of America is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Bank of America were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Miami, there would not be a significant difference in time to foreclosure.  Were Bank of America underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

80.     The HUD/Treasury Report confirms that time to foreclosure is an important indicator of ~~predatory~~**discriminatory** practices*:* "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[23]

**3.     Data shows that the discriminatory ~~loan terms~~lending practices cause the foreclosures in Miami.**

81.     Bank of America's discriminatory lending practices cause foreclosures and vacancies in minority communities in Miami.

82.     ~~Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers into~~**Issuing** more expensive and riskier loans~~,~~ **to minority borrowers than the** loans for which they qualify **and are issued to similarly situated white borrowers** can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who ~~is steered in this manner~~**receives a more expensive loan** must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage. In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had Bank of America ~~made the loan without improperly steering the borrower into a subprime, or less advantageous loan.   Steering borrowers in this manner, therefore, causes~~**not issued a more expensive loan in violation of**

---

[23] U.S. Dep't of Housing & Urban Development and U.S. Dep't of the Treasury, *Curbing Predatory Home Mortgage Lending,* at 25 (2000) ("HUD/Treasury Report"), *available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf.

**the Fair Housing Act.   The Bank's discriminatory lending conduct therefore casues** foreclosures and vacancies.

83.    Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that they own subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender such as Bank of America solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance their existing loan into a larger loan without properly underwriting them to assure that they can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain given the borrower's present debt obligations and financial resources. In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

84.    A regression analysis of loans issued by Bank of America in Miami from 2004 to 2012 controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a ~~predatory~~**discriminatory** loan is 1.721 times more likely to result in foreclosure than a ~~non-predatory~~**non-discriminatory** loan.

31

85.     The regression analysis also demonstrates that a ~~predatory~~**discriminatory** loan made to an African-American borrower was 2.744 times more likely as a ~~non-predatory~~**non-discriminatory** loan made to a white borrower with similar borrower and underwriting characteristics to result in foreclosure.  A ~~predatory~~**discriminatory** loan made to a Latino borrower was 2.861 times more likely as a ~~non-predatory~~**non-discriminatory** loan made to a white borrower with similar risk characteristics to result in foreclosure.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

86.     A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board.  Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[24]

---

[24] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005), *available at*
http://neighborworks.issuelab.org/resource/municipal_cost_of_foreclosure_a_chicago_case_study.

87.     This significant report highlights the foreseeability of foreclosures arising from ~~predatory~~**discriminatory** lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

88.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites. The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For example:  approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[25]

89.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[26]

## VI.   INJURY TO MIAMI CAUSED BY BANK OF AMERICA'S DISCRIMINATORY LOAN PRACTICES

90.     Miami has suffered both non-economic and economic injuries as a direct result of Bank of America's ~~pattern or practice of reverse redlining and the resulting~~**longstanding,**

---

[25] Center for Responsible Lending, *Lost Ground, 2011, supra,* n.19.
[26] *Id.* at 6.

**unbroken policy and practice of both intentionally steering minority borrowers in Miami into mortgage loans that have higher costs and risk features than more favorable and less expensive loans issued to similarly situated white borrowers, and engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners. These practices resulted in the** disproportionately high rate of foreclosure on Bank of America loans to African-Americans and Latinos in minority neighborhoods in Miami. Miami seeks redress for these injuries. The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Bank of America.

91.     Bank of America continues to engage in the discriminatory pattern or practice described herein with similar and continuing deleterious consequences to the City.

92.     Through the use of expert evidence and analytic tools such as Hedonic regression, Miami is capable of establishing that the Bank's discriminatory lending practices were the cause of the resulting injuries alleged herein in a manner that excludes other potential causes.

**A.     Non-Economic Injuries**

93.     Bank of America's conduct has adversely impacted the ability of minority residents to remain in their chosen neighborhood of the City and impaired the City's goals to assure that racial factors do not adversely affect the ability of any person to choose where to live in the City or to detract from the social and professional benefits of living in an integrated society.

94.     The Bank's ~~predatory~~**discriminatory** lending practices have adversely affected the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community, which is the purpose and mission of the Miami's Department of Community & Economic Development.   The Department, which has responsibility for operating the City's fair housing program, is designed to "affirmatively further fair housing objectives of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, as amended, and other relevant federal, state, and local housing laws." In discharging that responsibility, the Department "actively works to reduce illegal housing discrimination. The City promotes equal housing opportunity through education and training, monitoring and investigating fair housing complaints utilizing techniques to support fair housing litigation, and conducts research and studies to identify and address fair housing impediments."[27] The Bank's discriminatory lending practices directly interfere with the City's ability to achieve these important objectives.

**B.      Economic Injuries**

95.     The City has suffered economic injury based upon reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.   In addition, the City has suffered economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Bank of America's illegal lending practices.

---

[27] City of Miami, Community & Economic Development Department, *Fair Housing,* http://www.miamigov.com/communitydevelopment/pages/housing/FairHousing.asp.

1. **Miami has been injured by a reduction in property tax revenues from foreclosures caused by** ~~discriminatory loans issued by Bank of America~~<u>Bank of America's discriminatory lending practices</u>.

96. When a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood. These decreased property values in turn reduce property tax revenues to the City.

97. As property values drop, Miami communities could lose many millions in property tax revenues from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.

98. Homes in foreclosure tend to experience a substantial decline in value relative to those that are not in foreclosure (e.g., 28%).[28] The relative decline in property values can be measured by a number of objective criteria, including the well-established Case-Shiller Home Price Index for the Miami Metropolitan Statistical Area.

99. A portion of this lost home value is attributable to homes foreclosed as a result of Bank of America's discriminatory loan practices.

100. The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Miami.

101. Bank of America's foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable. This in turn reduces the property tax revenues collected by Miami.

---

[28] Campbell, John Y., Stefano Giglio & Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, *"Forced Sales and House Prices"* (Apr. 2009), *available at* http://www.nber.org/papers/w14866.pdf?new_window=1.

102.    Property tax losses suffered by Miami as a result of vacancies resulting from Bank of America's foreclosures are fully capable of empirical quantification.

103.    Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Bank of America foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Bank of America foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more.  Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

104.    The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (e.g., ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

105.    Foreclosures attributable to Bank of America in minority neighborhoods in Miami can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Bank of America foreclosures or other causes.  The loss in property value in minority neighborhoods in Miami attributable to Bank of America's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

37

106.     Various studies establish that Hedonic regression can be used for this purpose. A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[29]

107.     Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[30]

108.     These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

109.     And most recently, a Los Angeles study reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n ~~Miami~~**Los Angeles** impacted homeowners could experience property devaluation of $53 billion."[31] This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

110.     Application of such Hedonic regression methodology to data regularly maintained by Miami can be used to quantify precisely the property tax injury to the City

---

[29] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure:  The Impact of Single-Family Mortgage Foreclosures on Property Values,* 17 Housing Policy Debate 57, 69 (2006).

[30] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy:  Linking Community Organizing and Research to Leverage Blight Policy,* at 21 (2004).

[31] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods,* at 3 (2011) ("Cost to Los Angeles Report").

caused by Bank of America's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

> **2.  Miami is injured because it provided and still must provide costly municipal services for foreclosure properties in minority neighborhoods as a direct result of ~~discriminatory loans originated or purchased by Bank of America~~Bank of America's discriminatory lending practices.**

111.    Bank of America foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties. Even prior to completion of the foreclosure process, data shows that 20% of homes are vacated.[32] These services would not have been necessary if the properties had not been foreclosed upon. Moreover, these foreclosures resulting from Bank of America's unlawful conduct have contributed to the necessity for the City to divert essential municipal services that would have been utilized for other purposes to promote the health, welfare, and safety of its residents.

112.    Bank of America's ~~predatory~~**discriminatory** lending and the subsequent foreclosures have put a strain on the resources of the City's Police Department and negatively impacted the ability to police a wide assortment of communities within the City of Miami over the last several years.

113.    For example, abandoned foreclosed properties required the Police Department to dedicate countless man-hours to respond administratively to issues which required it to deploy, in numbers and frequency otherwise unusual, uniformed officers and plain-clothed detectives, and to seek the assistance of Code Enforcement Officers and other resources from other Departments within the City of Miami. This response was caused in part by the

---

[32] *See* RealtyTrac, *Owner-Vacated Properties Represent 20 Percent of All Foreclosures Nationwide* (June 2013), *available at* http://www.realtytrac.com/content/foreclosure-market-report/owner-vacated-foreclosure-update-7771.

increased level of crime plaguing the neighborhoods as a result of foreclosed and abandoned homes.  The crimes generating these additional resource requirements include burglaries to the properties, and the surrounding homes, drug sales, vagrancy, home squatters, and an increased level of prostitution and lewd conduct.

114.   Additionally, abandoned homes were magnets for individuals who repeatedly burglarized unoccupied and abandoned homes to rip copper tubing and wiring from the interior of the homes.  This often left water spewing out of the homes, causing thousands of dollars' worth of damage to the homes.  This occurrence had a negative impact on the property value of not just that home, but the remaining residences of the neighborhoods, all the while creating an increased fear of crime and victimization among residents.  Though many of these problem areas were identified by beat officers on regular patrol, many of the abandoned properties prompted individual homeowners, homeowners' associations, and neighborhood watch groups to contact the Miami Police Department.  These complaints came in the form of emails, phone calls, and personal complaints that were directly received by the Police Department, as well as through other City Departments, such as Code Enforcement, Public Works, the City Manager's office, as well as City Council members' and the Mayor's office.

115.   These complaints required officers to consistently check on these properties through special watches, directed patrol, and Problem Oriented Policing ("POP") projects. They sometimes resulted in arrests, but regardless of the outcome, they required a disproportionate amount of resources to manage the problem.

116.   Likewise, the Miami Fire Department has sent, and will continue to send personnel and resources to Bank of America foreclosure properties to respond to a variety of fire-related problems that arise at these properties because of their foreclosure status.

117.   The Miami Building Department and Code Enforcement/Code Compliance Departments have devoted, and will continue to devote personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following:  (a) inspect and issue permitting violations in contravention of Florida statutes 553 and the Florida Building Code; (b) inspect and issue violations of the Miami City Code and Florida statutes 162; (c) condemn and demolish vacant structures deemed an imminent hazard to public safety.

118.   The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, (v) painting and removing graffiti at vacant properties.  Occasionally, some of these services are performed by the City's General Services Administration Department.

119.   The Miami City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources to perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following:  (a) prosecuting code enforcement cases; (b) preserving the City's lien rights at judicial foreclosure proceedings; and (c) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

120.   The City is required to administer and fund the Unsafe Structures Board, which was formerly under the jurisdiction of Miami-Dade County.

121.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services. . . . Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[33]

122.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VII.   SAMPLE PROPERTIES IN THE CITY OF MIAMI

### A.   Foreclosures

123.   Plaintiff has preliminarily identified three thousand three hundred and twenty-six (3,326) discriminatory loans issued **to minority borrowers** by Bank of America in Miami between 2004 and 2012 that resulted in foreclosure. [34] **or demonstrate characteristics likely to result in foreclosure.[34] These loans are deemed to violate the FHA and are**

---

[33] *Cost to Los Angeles Report, supra,* n.31.

[34] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery. This conclusion derives from the fact that because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank. For these reasons, Plaintiff will also be able to provide additional specific property addresses corresponding to foreclosures with the benefit of discovery.

[34] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery. This conclusion derives from the fact that because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank. For these reasons, Plaintiff will also be able to provide additional specific property addresses corresponding to foreclosures with the benefit of discovery.

discriminatory because they were issued to minority borrowers and were more expensive than the loans issued to similarly situated white borrowers based upon the regression analysis described earlier.  These loans issued by Bank of America are continuing to enter the foreclosure process.  The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

240 NW**572 NE** 67th Ave**St. Unit 4**, 33126**33138**[35]

1320**3050** NW 35th St**21st Ave. Unit 5**, 33142[36]

1842**4550** NW 43rd**9th** St. **Unit E918**, 33142**33126**[37]

4321 NW 11**1690 SW 27**th Ct**Ave. Unit 708**, 33127**33145**[38]

**B.**     ~~Predatory~~**Discriminatory** Loans Issued Subsequent to December 13, 2011.

124.     Bank of America has continued to issue discriminatory loans **to minority borrowers** in Miami subsequent to December 13, 2011**.  These loans are deemed to violate the FHA and are discriminatory because they were issued to minority borrowers and were more expensive than the loans issued to similarly situated white borrowers during the limitations period based upon the regression analysis described earlier.  Upon information and belief, as well as historic experience, a significant number of the**

---

[35] This borrower is Hispanic and received a conventional loan. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[36] This borrower is Hispanic and received a conventional loan. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[37] This borrower is Hispanic and received a conventional loan. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[38] This borrower is Hispanic and received a conventional loan. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

**properties corresponding to issuance of discriminatory loans subsequent to December 13, 2011 will result in foreclosures or other adverse events that will cost the City a loss of tax revenues and significant remediation costs**.   A sample of property addresses corresponding to the issuance of these loans **to minority borrowers all of which closed (i.e. "originated") during the limitations period** is set forth below:

   1350 NW 8th Ct., Unit C-3, 33136[39]

   701 Brickell Key Blvd., Unit 2408, 33131[40]

   1350 NW 8th Ct., Unit B3-5, 33136[41]

   800 N. Miami Ave., Unit E-1005, 33136[42]

 **125.** **An examination of publicly available information on loans issued during the limitations period strongly supports the conclusion that a greater number of more expensive and/or riskier loans were issued to minority borrowers than to non-minority borrowers during the two years preceding the filing this complaint.  The data available to the City prior to discovery demonstrate significant differences in the treatment of those categories.  However, the small size of the available sample does not lend itself adequately to statistical analysis in isolation.  Upon information and belief, the disparity**

---

[39] **This borrower is Hispanic and received a conventional loan with a loan origination date of April 17, 2013. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.**

[40] **This borrower is Hispanic and received a conventional loan with a loan origination date of March 5, 2013. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.**

[41] **This borrower is African-American and received a conventional loan with a loan origination date of June 8, 2012. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.**

[42] **This borrower is Hispanic and received a conventional loan with a loan origination date of February 3, 2012. Plaintiff has the name for this borrower but has omitted it for privacy reasons. In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.**

**exemplified by the examination of the earlier loans persists.  Still, the City maintains that, because it has pleaded a continuing violation, the continuance of the same lending practices that result in a discriminatory disparate impact melds the timely instances of that practice into the pre-limitations period instances of that practice to constitute a single claim, requiring but a single evaluation of the overall disparate impact.**

**VIII.   CLAIM FOR RELIEF**

**(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

~~125~~**126**.      Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

~~126~~**127**.      Bank of America's acts, policies, and practices as described constitute intentional discrimination on the basis of race.  Bank of America has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Miami for different treatment than residents of predominantly white neighborhoods in Miami with respect to mortgage lending.  Bank of America has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Bank of America has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Bank of America has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

~~127~~**128**.      Bank of America's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly

African-American and Latino neighborhoods in Miami as compared to similarly situated whites and residents of predominantly white neighborhoods in Miami.  This adverse and disproportionate impact is the direct result of numerous factors, including, but not limited to: **knowing about lending practices that either risked or resulted in** failing to adequately monitor the Bank's practices regarding mortgage originations, purchasing, marketing, sales, and risk management functions; ~~steering~~ failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; **placing** borrowers ~~into~~in more expensive ~~and~~**,** riskier loans ~~than~~ they ~~otherwise~~ qualified for; ~~reverse redlining;~~ failing to properly underwrite refinance and hybrid adjustable-rate loans; ~~failing to properly underwrite loans based upon traditional underwriting criteria (i.e., FICO score, employment history, debt-to-income ratio, loan-to-value ratio); giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; setting interest rate caps~~**allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford; marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods**; requiring substantial prepayment penalties that prevent borrowers ~~with improved~~**whose** credit **has improved** from refinancing their ~~predatory~~**discriminatory** loan to a prime loan; ~~and~~ charging excessive points and fees that are not associated with any

increased benefits for the borrower**; creating a compensation scheme incentivizing employees to issue discriminatory loans; failing to .monitor and ensure compliance with federal fair lending laws**. These practices, which are united because they represent manifestations of the same continuous and unbroken practice of ~~steering minority borrowers into disadvantageous loans~~**engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners**, have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Miami to receive mortgage loans from Bank of America that have materially less favorable terms than mortgage loans given by Bank of America to similarly situated whites and residents of predominantly white neighborhoods in Miami, and that are materially more likely to result in foreclosure.

~~128~~**129**. Bank of America's residential lending-related acts, policies, and practices ~~constitute reverse redlining and~~ violate the Fair Housing Act as:

    (a)    Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

    (b)    Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

~~129~~**130**. Bank of America's policies or practices are not justified by business necessity or legitimate business interests.

~~130~~**131**. Bank of America's policies and practices are continuing.

~~131~~**132**. The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Bank of America's conduct.

132133.     The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Bank of America's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Bank of America's discriminatory lending.

133134.     Bank of America's policies and practices, as described herein, had the purpose and effect **and/or purpose** of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African American and Latino borrowers.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.     Enter a declaratory judgment that the foregoing acts, policies, and practices of Bank of America violate 42 U.S.C. §§ 3604 and 3605;

B.     Enter a permanent injunction enjoining Bank of America and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Bank of America and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described

herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

   C.  Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Miami for its injuries caused by the conduct of Bank of America alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

   D.  Award punitive damages to the City in an amount to be determined by the jury that would punish Bank of America for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

   E.  Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

   F.  Require payment of pre-judgment interest on monetary damages; and

   G.  Order such other relief as this Court deems just and equitable.

Date: ~~November 30~~ **April 29**, ~~2015~~**2016**   Respectfully submitted,

           /s/Lance A. Harke
           Lance A. Harke (Florida Bar No. 863599)
           *lharke@harkeclasby.com*
           HARKE CLASBY & BUSHMAN LLP
           9699 N.E. Second Avenue
           Miami, FL 33138
           Telephone:  (305) 536-8220

           Robert Peck (*pro hac vice*)
           *robert.peck@cclfirm.com*
           CENTER FOR CONSTITUTIONAL
           LITIGATION, P.C.
           777 6th Street N.W., Suite 520
           Washington, DC 20001
           Telephone:  (202) 944-2803

           Victoria Méndez (Florida Bar No. 194931)
           *vmendez@miamigov.com*
           CITY OF MIAMI

OFFICE OF THE CITY ATTORNEY
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33130
Telephone:  (305) 416-1800

~~Steve W. Berman *(pro hac vice)*~~
~~*steve@hbsslaw.com*~~
~~HAGENS BERMAN SOBOL SHAPIRO, LLP~~
~~1918 Eighth Avenue, Suite 3300~~
~~Seattle, WA 98101~~
~~Telephone: (206) 623-7292~~

~~Elaine T. Byszewski *(pro hac vice)*~~
~~*elaine@hbsslaw.com*~~
~~Lee M. Gordon *(pro hac vice)*~~
~~*lee@hbsslaw.com*~~
~~HAGENS BERMAN SOBOL SHAPIRO, LLP~~
~~301 North Lake Avenue, Suite 203~~
~~Pasadena, CA 91101~~
~~Telephone: (213) 330-7150~~

Erwin Chemerinsky (*pro hac vice*)
*echemerinsky@law.uci.edu*
UNIVERSITY OF CALIFORNIA, IRVINE
401 East Peltason Drive, Educ. 1095
Irvine, CA 92697
Telephone:  (949) 824-7722

Joel Liberson (*pro hac vice*)
*joel@taresources.com*
Howard Liberson (*pro hac vice*)
*howard@taresources.com*
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA 90245
Telephone:  (310) 426-2361

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed on April 29, 2016 with the Clerk by using the CM/ECF system, which will send notification of such filing to all attorneys of record.

s/Lance A. Harke_____

51

| Summary report: Litéra® Change-Pro TDC 7.5.0.166 Document comparison done on 5/2/2016 3:49:58 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Inactive | |
| **Original filename:** FIN -- Second Amended - Copy.docx | |
| **Modified filename:** FIN -- Third Amended.docx | |
| **Changes:** | |
| **Add** | 220 |
| Delete | 210 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 1 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 438 |